Oh, you may proceed. Thank you, Your Honor. Good morning. Paul Mazzina for the appellant, Sammie Lewis Stokes. Your Honor, Sammie's childhood was marked by severe abuse and neglect. His mother and stepfather were alcoholics, were notorious for their violence and for the way they mistreated Sammie and his sister, Sarah. This is classic, compelling, mitigating evidence, but the jury didn't hear a word about it. Instead, the defense's only penalty phase witness was a prison warden who testified that if Sammie didn't behave in prison, he could be killed. As a result, the jury didn't hear anything that would have humanized Sammie or helped explain his behavior. And in at least four cases, Williams, Wiggins, Rompia, and Porter, the Supreme Court has overturned death sentences based on trial counsel's failure to investigate and present similar mitigating evidence to what was available here. And the court did that even under the deferential EDFA standard that applied in those cases but doesn't apply here. If those cases mean anything, they mean that Sammie Stokes is entitled to a new sentencing hearing and one fair chance at convincing a jury to spare his life. I want to address the merits of this claim and also why a PCR counsel was deficient in not raising it. And to the extent there's time and the court has questions, I'll also address the issue of Mr. Sims' conflict of interest. So, Your Honor, there's no dispute that Sammie's childhood was filled with the kind of trauma and abuse the Supreme Court has held is important for a jury to consider. And I won't try to describe all of that evidence now. I know the court is familiar with it. But just briefly, there's no dispute that Sammie was routinely beaten and whipped with electrical cords, often in front of friends and neighbors, that his stepfather beat his mother constantly, sending her to the hospital. Sammie and Sarah experienced sexual abuse. And because their parents were constantly drunk, they had no adult care or guidance. They barely attended school. And they would often steal food from neighbors, just have something to eat. And I think it's clear under Wiggins that trial counsel's investigation of these facts was woefully deficient. Just as in Wiggins, that investigation identified red flags that should have prompted further investigation, but trial counsel didn't pursue them. And I think to see how deficient this investigation was, really, the best thing to do is just to compare the notes of trial counsel's investigator, Ms. McKay, which start at page 2527 of the joint appendix, and contrast them with the subsequent investigation by Ms. Dean. And her notes start at page 2546, and then they pick up at page 3213. Ms. McKay started interviewing witnesses less than three weeks before the trial, and she was actually still conducting interviews while the trial was going on. She talked to a handful of relatives, ex-girlfriends, several of whom said they didn't know Sammie or his family well. And she learned from Sammie's sister about their parents drinking, about the violence in the home, at least at a high level, but she didn't follow up. Now, you look at what Ms. Dean did, and it's much more of a proper mitigation investigation. She talked to teachers, neighbors, people in the community, and from all of those interviews, a very clear and consistent theme emerged. And that theme was, everybody knew. Everybody in this community knew how bad Sammie and Sarah had it. One neighbor said everybody knew that these kids weren't cared for and were pretty much raising themselves. Another said people would talk about how the kids should be taken away, but it never happened. And one interviewee even said that he thought that Sammie's stepfather, Richard, trained Sammie to be how he is. Trial counsel didn't learn any of this, because just like in Wiggins, they had these red flags of alcoholism issued in the home, and they didn't follow up on it. And you can see this clearly, I think, in trial counsel's testimony in the hearing below. So Mr. Johnson testified that he thought Sammie just had, in his words, poor upbringing that was similar to the struggles that other African Americans were experiencing at the time. That's just not the reality. The reality is witnesses consistently said that Sammie's situation was much worse than even other people in this poor and struggling community. Now, under Wiggins, it's clear that there can be no deference. There's no need for any inquiry counsel had strategic reasons for not presenting mitigating evidence, because if they didn't do an adequate investigation, they can't have made an informed decision about that, and that's the end of the deficiency prompt. But if you do look at what trial counsel said about why they didn't present the mitigating evidence they had, it really doesn't hold up to any kind of scrutiny. They never gave anything like a coherent explanation. They basically just said they had a feeling that this jury wouldn't be receptive to mitigation. And they couldn't explain where that feeling came from. To the extent they offered any explanation at all, it was just based on bogus racial stereotypes. And I'd point you in particular, Mr. Sims, around page 3469-72 of the joint appendix, he has some vague references to the overall look of the jury, to its composition, including the fact that there were African Americans on the jury, and how the jurors reacted to some things during trial. He doesn't say what. And of course, this jury never heard any mitigating evidence, so Mr. Sims had no opportunity to observe how the jury would have reacted to that evidence. And Mr. Johnson, I already mentioned at page 3524, he said, how do you go to a jury and say, look, we want you to look at the fact that he had a poor upbringing, particularly African American, which a lot of us had struggles coming up. Again, nothing in the record suggests that the five African American jurors, or for that matter, the seven white jurors, had experienced any struggles that were remotely comparable to what Sammy went through, or that any of them would have been unable or unwilling to consider mitigating evidence. And so, so counsel, if I could ask, follow up on that. Yeah, I hear your arguments, and they're written. And I've read that, you know, a number of times. And I guess this is my question. Um, you know, it is a if a if trial counsel feels that the mitigating evidence, and I know you had, let me, let's let's assume in this question that there was an adequate investigation, I know you can test that. But let's assume they have the evidence. And there's a belief that given the the gruesome nature of the charges and the evidence, that trying to explain it in that way, you know, based on his interpretation of the way the trial is going, and his view of the jurors, it's going to do more harm than good. Is it your testimony that he doesn't have the the on the way the, you know, the trial is going? Is that and that just seems like, I mean, try, I know, this is a extremely serious matter. And there's ABA guidelines. So I know, it's not your normal case. But But that happens a lot in trials. And I'm just trying to see how we how we consider that? Or do we just throw that aside? If you don't think it's adequately explained? Sure, Your Honor, a few points about that. And thank you for bracketing the question of the adequacy of the investigation. I think the basic point in response is that developing and presenting mitigating evidence is such a core part of capital representation, especially where, like here, the defendant's guilt isn't in doubt. And so really, you know, convincing one juror to spare the defendant's life is trial counsel's entire job. In this case, the decision not to put on any social history evidence at all, when so much of it is available, is an extraordinary and momentous one. It demands a commensurate justification. And we're not here saying that counsel can never make that decision not to present it. But I think it can't be enough for trial counsel just to say, I had a feeling it wouldn't work. And that feeling was based on the jurors race and, you know, some vague reference to their demeanor. And of course, you know, it wouldn't be unexpected at all in a case like this that the jury might have been reacting with disgust or horror to some of the facts of the crime. That's typical in death penalty litigation. But the Supreme Court has consistently found prejudice where substantial mitigation evidence existed and trial counsel didn't present any of it, even through the lens of EDPA, which doesn't apply here, and even where the aggravating evidence was extreme. And I point the court in particular to Rumpia, which of course was available to PCR counsel. In Rumpia, I think it's a good yardstick for how the Supreme Court has viewed these kinds of cases. The defendant there stabbed a bar owner and set him on fire. The jury found torture, which of course the jury here did not find. And the jury in Rumpia also heard about a history of violent felonies the defendant admitted, including a rape in which he cut the victim's knife and held her at knife point while he raped her for an hour. And the court in that case didn't even view prejudice as a close question. It said it, quote, goes without saying that if this jury had also heard evidence of Mr. Rumpia's, all of the abuse and deprivation that he had experienced as a child, which was very similar to what was available here, it goes without saying that that might have swayed at least one juror to vote for life. So I think in light of that, it's very hard to say either that there was no prejudice here or that you can rely on trial counsel vague statements about we had a feeling that this wouldn't work. And of course, the jury here was very close to voting for life. We know the jury, even though they didn't hear any mitigating evidence at all, they didn't find the two key aggravating factors. They didn't find torture. The prosecution said that in closing was the most important aggravating factor. And they didn't find the murder of Doug Ferguson. And we know they were seriously considering a life sentence. The jury sent out a note asking about the privileges that Mr. Stokes would have if he were sentenced to life. Mr. Sims, who the state says had such a good read on this jury, he testified that he felt the jury was, quote, looking for that concrete thing they could hang their hat on to give him a life sentence. And the state even elicited testimony from Mr. Sims that a juror called him after the trial and said, quote, we were looking for a way to give him life. So this is a jury that was almost in equipoise, even without having heard any mitigating evidence at all. Trial counsel was able to say in closing the facts were all one way, and the jury still considered life. So I think if they had heard some of this abundant mitigating evidence that was available, there's certainly at least a reasonable probability that some juror would have voted for life. And I think a lot of what I've said, I'll turn to Peace Corps counsel. A lot of what I've said about the merits really also goes to why Peace Corps counsel were deficient, as they themselves admitted in not presenting this claim. They admitted that there was no rational reason for dropping the claim, which I think was clearly stronger than most, if not all, of the claims they presented. And they admitted that they basically just lost sight of this claim because they became distracted by what they called the shiny object of the intellectual disability claim. And you can understand how that happened, right? Atkins, at that point, was a recent decision. They thought that the intellectual disability claim would give them a vehicle for talking about a lot of the same evidence as the mitigation claim in terms of Sammy's deprived childhood. But the disability claim was better because if it was as opposed to just getting him a new sentencing hearing. So they shifted their focus to that. But then by 2007, they knew that that claim was not viable. It hadn't worked out. And at that point, the state admits they could have gone back to the original mitigation claim, which was very strong. But they just didn't. They didn't think about it. It didn't occur to them at that point to go back and say, because we don't have an intellectual disability claim anymore, let's go the strength of the mitigation claim with the seven other claims they brought. So there was no winnowing here. There was no, we're just going to present our strongest claims. Of those seven claims, four of them, PCR counsel ultimately abandoned after five years without even seeking a ruling. Two more were claims alleging ineffective assistance of appellate counsel for failing to raise an error that was undisputed, was not preserved at trial. So those claims were obviously not viable. And I really don't know how any reasonable lawyer could have looked at the trilogy of cases that PCR counsel had available to them at that point, Williams, Wiggins, and Rumpia, and not thought that this mitigation claim was worth pursuing. And I think Mr. Lominax said it pretty well. At page 3028 of the appendix, he testified, he says, I can't remember a case that's this aggravated where no mitigation was presented at trial, and then literally no mitigation was presented at post-conviction relief action. He said, I don't know of a case in which I was involved where that ever happened, and I don't think it should have happened here. And I think that's clearly right. It shouldn't have happened here. Just briefly, Your Honor, but the other side of the coin from what trial counsel didn't present is what they did present. Their sole penalty phase witness was Mr. Aiken, who was presented as a witness on prison adaptability, but who didn't testify that Stokes was adaptable to prison. His view of prison adaptability was that if a prisoner commits violence in prison and is punished for that, that's evidence of adaptability. The prosecution, I think reasonably in closing, called that Alice in Wonderland view of adaptability, said it didn't make any sense. And there was no reason to think that that kind of testimony was going to persuade a juror to spare Mr. Stokes' life. So it's not as if trial counsel had some great mitigation strategy to pursue in lieu of presenting actual traditional mitigating evidence. Counsel, sorry, Judge Harris, can I just ask a quick question? And I think you've probably answered it with the structure of your argument. But just assuming hypothetically we agreed with you on your claim involving the mitigation evidence, there'd be no need for us to reach the other two claims you've put forward, right? That's right, Your Honor. A new sentencing is a new sentencing. Okay. Exactly. Thank you. And I see my time has expired. So unless there are more questions, I'll take what's left. Thank you, Mr. Mazina. Mr. Ross? May it please the Court. Strategic decisions made after a reasonably thorough investigation are virtually unchallengable. That's what this case boils down to. Second guessing an attorney's decision 20 years after the fact. Mr. Stokes characterizes this investigation as cursory, as half-hearted, but simply saying that doesn't make it true. This case boils down to what did trial counsel do? The first step in assessing a Strickland claim is looking at the reasonableness of their investigation. And Mr. Stokes' case falls apart at step one. Rather than focusing on what trial counsel didn't do, it's important to address what they did do. And in this case, trial counsel hired two fact investigators, one of which was specifically devoted to developing mitigating evidence. That person interviewed family members, friends, employers, girlfriends, all the types of folks that you need to develop mitigating evidence. Trial counsel also retained Dr. Augustus Rogers, a professor of social work at the University of South Carolina. He interviewed Mr. Stokes. He was there ready to testify at trial, and he was going to testify to a lifetime of deprivation and the like. Social history was just one piece of defense counsel's strategy at sentencing. They also had a psychiatrist available. They were going to offer evidence of Mr. Stokes' AIDS diagnosis. Their argument was going to be with Mr. Stokes' frail condition. Remember, this is 1999 with an AIDS diagnosis. With that frail condition, he was unlikely to hurt anybody in prison. They were also going to argue with that condition, he already had a death sentence, that the jury wouldn't need to make that difficult decision. Additionally, trial counsel had a neuropsychologist who was there prepared to testify. He was going to discuss brain abnormality. But Mr. Stokes himself pulled the rug out from his own counsel. He vehemently refused to allow trial counsel to present that testimony. And so counsel, if I could stop you there, this is Judge Quattlebaum. Assume that, you know, I hear you on the AIDS strategy. And that, you know, as you point out, may have been taken away. And the trial counsel has, you know, other mitigation, you know, kind of arrows in its quiver. And, you know, they don't use them. I mean, I get that your plan A didn't work out. Seems to me the question is, okay, what do you do then? And, you know, he, you know, doesn't put up the mitigating evidence. That's a traditional approach to these cases. What's your explanation that, you know, that he doesn't adequately give a justification for doing that? Two reasons. Number one, he specifically saw the reaction of the jury as the details of this brutal crime came in. This was not an armed robbery gone bad. Counsel, can I ask you something? Because I, this is a part of the story. I just have trouble understanding. What did he think was going to happen? What surprised him about the jury's reaction to the details of this gruesome crime? What did he learn about the, how did that surprise counsel and make him decide, oh my goodness, let's not call the mitigation witnesses who are sitting outside the courtroom? Well, it's one thing to review a file, review autopsy photos, review the state's case and interpret that. And that's what happened. You can start with an assessment of just how bad it is, but until the jury physically reacts, at that point, it's just your assessment. And this was, again, this was not an armed robbery gone bad. A woman was raped, murdered, scalped. Her vagina was cut out. She was left to rot in the woods. And again, it's one thing to review a cold case file, but when you see a jury's reaction in court, you got to respond. Everybody has a strategy. Mr. Ross, can you hear me? Yes, sir. Okay. Thank you. You said when you hear, reaction, fair enough. I mean, I don't know how one is. There's Harris question. I don't know how you could expect going through this case, not to receive that any human being seeing anything close to this. I'd be, I'd be afraid of the jury who's hearing the case. If I didn't have that reaction, that's a part of your strategy, but to see that, let's take that. That is, let's say you was, he was surprised. Wouldn't that mean that you have to double up what you got to do to try to respond to that? But don't you agree with that? You're a lawyer, you're a professional. I mean, you can't go crumbling, can't seeing that. Don't you then have to say, wait a minute. I really have to double down anything that I thought maybe I would do a little. I have to do more. Wouldn't you agree that as a professional, as a lawyer, that'll be your reaction? I'm going with your theory that this was an incredible taken aback moment. Wouldn't it not? Well, if Strickland makes one thing. I'm not talking about Strickland. I'm talking about what you, you open this up and saying that that was a horrendous moment for him. I'm asking you, wouldn't that make a professional person, a lawyer in a death case and say, wow, I really have to deal with this. And we need, and my mitigation is the only part that I can deal with at sentencing. Right. Trial advocacy is as much an art as it is a science. I agree with that. I've did it for 20 years and you're right, you absolutely did. But go ahead. Mr. Stokes makes a point that you only need to convince one juror to side with you. And that is a true point. But you only get 12. So if you start out by alienating half of your jury, you're making the job of convincing just one person that much more difficult. And that's what trial counsel would do. How would you alienate the jury to tell them that this boy saw his sister being put out for prostitution, that they had to steal, but to eat, that they were sexually abused, that's alienating someone. Trying to mitigate the horrendous details of this crime with that particular jury in 1999, Orangeburg County, South Carolina could be offensive. And the person in the best position to understand that was trial counsel. He lived in that community. He tried cases in that community and he saw just- I have one last question. I don't want to dominate this, but let me tell you, I'm going to assume everything you just argued. All right. But at the end, you don't put on mitigation. Doesn't he have to say to the jury he should live? Would that have to be offensive? If it's offensive to state that his childhood is offensive to them, then it has to be doubly offensive to him to stand up and say at the end, don't kill him, let him live. I don't understand that. Explain that to me, Mr. Ross. Trial counsel was doing just that. Trial counsel knew that in arguing for life, that social history that they had was not entirely favorable. He knew that in offering, particularly the sister, that he was going to offer negative details that would be devastating to his claim that the co-defendant was responsible for the more egregious aspects. Yes, ma'am. I'm sorry. Did he- did trial counsel say that at the hearing, that the reason he didn't put on this testimony is because he was worried about bad stuff that would come out? I thought he went thoroughly with the first thing you said, which is he thought it would offend the jury to put on a mitigation case. He did. Later on in his testimony, he said he was concerned that the- coming out. And we know for a fact that he reviewed the investigator's file in this case. He billed for it. He met with the investigators. And the devastating information, particularly again from the sister, is in black and white in the investigator's file. Make no mistake, Sammy Stokes is guilty of the offense of scourge. There's no doubt that he participated in the rape. He participated in the murder. He participated in the murder of Doug Ferguson. What trial counsel was trying to do was place some of the blame on the co-defendant charged. And that was Mr. Martin. He was trying to put the blame on him for scalping that woman, cutting out her vagina. And he made that argument throughout the guilt phase, throughout the sentencing phase. And if he offers the sister's testimony, if he offers the evidence of his social history, he's going to expose the jury to the relationship Mr. Stokes had with that co-defendant growing up. And that was not a positive relationship for Mr. Stokes. That is not something he wanted the jury to understand. There was evidence that Mr. Stokes beat him up his whole life, that he bullied him, that Mr. Martin was afraid of him. And you simply can't argue to the jury, this guy over here is a real bad guy. The state made a deal with the devil. I just want to make sure. So this is a different argument. So which, I mean, I guess your argument is that for two independent reasons, each of which was objectively reasonable, this lawyer decided not to put on any case at all in mitigation, by which I mean an effort to humanize the defendant or bearing on his moral culpability. Two separate and independent reasons. One was he thought it would offend the jury. And the other was he thought it would, that if you ask, say a social worker to come in and talk about how he was beaten by his father, that would bring in evidence of his relationship with his co-defendant. So those two separate reasons. Two separate reasons. And is your, is your, but I just, cause, so I understand where we are doctrinally. Your bottom line point is that this is not even a substantial claim for Martinez purposes. We don't, we should not be reviewing it at all or that it's substantial, but it fails on the merits. It's not a substantial claim. And you think this is not a substantial claim. Okay. This is, this is not a substantial claim. And if you're looking at Martinez, you still have to overcome PCR counsel's alleged, you still have to prove PCR counsel was deficient in their handling of the case. And I think their investigation shows, again, they're acting reasonably. They had all the information that trial counsel had. Again, they hired additional folks to investigate the claim. Um, they developed that and they confirmed that social history was not entirely beneficial. That Mr. Stokes was known as the terror of branch school, that everybody in that small town knew about that social history. And we know for a fact that the prosecutor would have known that as well. Trial counsel testified at the evidentiary hearing that the police told him that his client was the terror of that small town. Can I ask you counsel, can I, can I, I have an overall concern that I want to give you a chance to address. Um, it seems to me, and we would need to be really careful if we wrote an opinion, um, agreeing with you, because it seems to me that a lot of what you're saying just kind of flies in the teeth of the Supreme court's cases on mitigation evidence. It is always the case that by the time we're talking about mitigation evidence in a capital case, the, the, the person we're talking about has done a lot of bad things. Like by definition, this is somebody as to whom there is negative information out in the world, but never the, and it, by definition, you will be asking a jury to consider something about the human nature of the defendant who has committed this terrible, terrible crime. If it were sufficient to say, well, the jury might be offended. And anyway, there's a lot of bad stuff about him too. Why would there, that just seems sort of totally inconsistent with the Supreme court just repeated. Like it's the one thing in these capital cases where they have been so clear and so emphatic so many times you have got to put this evidence in front of a jury. Your honor, there is no firm rule that you have to. Wiggins itself says that mitigating evidence is not required in every case. And in addition to Wiggins, there's Strickland itself, the granddaddy of them all. That was the case that we use to cite the standard for ineffective assistance of counsel claims. But in that case, the defense attorney didn't provide or didn't also have Berger versus Kemp cited in our brief situation closely resembling the facts of this case where you have a charged soldier down at Fort Stewart and he's trying to point the finger at another codefendant saying, well, I did it, but I'm not as bad as this guy. And the Supreme court found that that was a reasonable decision to make. Garden versus Wainwright, another case from the So there is no firm rule that you have to do it. In fact, Strickland says the opposite. Strickland says attorneys have wide latitude in how they're going to present the case. Yeah, no, I do hear what you're saying. And I think I probably overspoke or overstated the case. But if it were a sufficiently good reason not to put on mitigating evidence, that there is also negative character evidence about the defendant. Why would anyone ever have occasion to put mitigating evidence on? Why would the Supreme court so consistently insist that it be investigated, that jurors find this mitigating, that they do find backgrounds like this to be mitigating, to lessen a defendant's moral culpability? If all it takes to make all of that go away is that the person has also done bad things, I feel like we are left with a null set. This is not a situation where the person had just done bad things. This is a case where those bad things would shoot him in the foot on the defense he was trying to make. And again, one attorney may decide that was a reasonable response. One decision, if I were wearing my trial attorney hat, the issue is whether or not that decision was objectively reasonable. And it is objectively reasonable not to offer evidence that you know is going to take away your best argument in the case. And that was pointing the finger at the other defendant, particularly when you know that the jury may be inclined to find that or that attempt to mitigate these details as offensive. And additionally, it is important to point out the prejudice prong in this case. Mr. Stokes has to show deficiency of counsel or trial counsel. He has to show deficiency of counsel or PCR counsel. But he has also got to show prejudice as well under Strickland. And if you look at prejudice, you have got to consider the entirety of the proper evidence. What was actually presented at the federal evidentiary hearing? You have got to consider the good, the bad, and the ugly. And Mr. Stokes wants to talk a lot about the good, but he ignores the bad and the ugly. And the evidence that came in, came in primarily through Dr. Garbarino. And with all due respect to him, he lacked credibility at that hearing. The magistrate noted it from the bench, and she noted it in her report and recommendation. And there were several things, but the stake in the heart of his credibility was when he was confronted with an email he sent to federal habeas counsel. And in his own words in that email, he is revealing himself not to be interested in the truth, but simply trying to That is a Perry Mason moment. That is a Matlock moment. That's every prosecutor's dream to be able to confront an expert with that email. And if that had happened in front of the jury, the wind comes out of his sails. That is game, set, match for the state. There's also overwhelming, aggravating evidence here. So in looking at what would have been presented with their proffer, compare it with what was presented in 1999 and using Dr. Garbarino is something like shooting a freight train with a BB gun. It's gonna have no effect. This is a case where the man planned these crimes while in prison, while allegedly on good behavior in prison. He gets out, and within a week he's committed two of the most brutal murders that you can imagine. He mutilated and raped and killed a woman, and then he mummified a man with duct tape. What Garbarino had to say was not going to affect anything after the jury heard those facts or the details of this crime hurt his history. Mr. Ross. No, you go, Judge Harris. Excuse me, Judge Harris. No, please. Well, we all were children, so I think we all had that commonality. Can you imagine growing up and having a childhood like that? I mean, you talk about, yes, what he did was horrendous. It's a case that begs and cries out to say, how did this person get to this point? It's an incredible case and opportunity. I don't care what you say about what he did and all those things, bad things, like Judge Harris said. I don't think they thought in a way that this person was a choir boy and this was the first rodeo. But the point is that things can happen in your childhood that you never overcome. I mean, one instance, for example, seeing a parent hit by a car, just mangled, or death, those things. And you take this and multiply that by thousands for this person. I mean, you tell him he didn't see his mother until he was about five, and then he comes there, and then there's evidence about what her friend was doing to him, and all this is incredible. I just can't imagine being a child. I have to fend for myself. My sister has to steal food to eat or to be left alone in prostitution and all these things. You're telling me that that would offend a jury to know that the brutal crime that he did, not matched, not balanced, but there's also a brutal story about his life too. And to make a decision that I don't put an representation in the capital case. I know you represent the state, but that's your position, and that's effective representation. Your Honor, you don't want to jeopardize your other defense. The other defense was nothing. Whatever happened, it didn't matter. He was there. Whether he did these horrible things, that was a foregoing conclusion. Nobody was going to go up there. I mean, a good lawyer is not going to say, I'm doing this because this is going to exile what he did. No, I'm only doing this to let you know that a fragile, fractured, brutalized child became the man you see now. That's what lawyering is. Your Honor, at the end of the day, some crimes are so brutal, some crimes are so bad, death penalty is only just result. And that's what we have in this case. That may be true, but don't you let the jury decide that? And so they can balance all of your very aggressive and proper aggravating evidence against that? Nobody's saying that per se, death is not appropriate in the case. The point is the jury needs to have something before them to balance what an adversarial system is. The trial counsel didn't want that something to jeopardize his argument, and he reasonably concluded that it would. Because scalping a woman and cutting out her vagina, you can't avoid that. You have to try and do something to mitigate that. And that was the heart of the case, just how brutal this was. It wasn't just a rape and a murder. It was a rape and a murder, and you leave her in the rotten woods after you scalp her head. The best argument to make was that some other guy did that piece. And if he offers the evidence of his traumatic childhood, he knows that it's coming in. Can you just, I guess, I mean, I feel like I'm beaten as a child, and that his sister was prostituted out, and that he watched someone, his stepfather, I think it was, break his mother's jaw. Those witnesses will also have to testify to who committed, I guess I'm not understanding how that brings out the evidence you're talking about, about which of these co-defendants committed the mutilation at the scene of the crime. How is the father beat him going to be able to testify to that? I just, I'm not understanding. So the primary witness here we're talking about is the sister. Oh, I guess this is because we're bracketing the investigation. So we're assuming no thorough investigation has been conducted. They have not talked to any of the other people who know about this boy's childhood. The only witness they could, okay. They talked to multiple family members, relatives, employers. I mean, it's not like the PCR council hired a magician. They hired an investigator who went out and promptly learned a boatload of information that trial council was unable to discover. So obviously the investigation was not that good. I mean, whether it was, I don't want to prejudge whether it was constitutionally adequate, but we can agree, can't we, that the next investigator who went out discovered reams of information that the counsel, their decision was even reasonable as well. Again, you have three prongs to this claim. You got to do trial counsel's deficient performance, prejudice by trial counsel, then your counsel's investigation. And you just hit the nail on the head that that was more than thorough what PCR council did. And they came to the same conclusion as trial council. Well, PCR council did not say that they came to a conclusion that this claim would not prevail. PCR council said they don't know why they didn't put it in the petition and why they decided instead to put in claims that were so weak that they had to be dropped before the PCR court could get their hands on it. And then two claims that, I mean, I don't want to cast judgment or anything, but these ineffective assistance of appellate counsel claims were not exactly bulletproof. You're right. They were measured in their testimony. They said they couldn't remember why they dismissed the claim, but they supposed, and that was their actual words, that they suppose they got distracted. That was their testimony, but their actions speak louder than their words. And immediately after withdrawing this claim, they're taking intentional acts, notifying all the parties involved that they're invoking the attorney-client privilege, that because they're not alleging ineffective assistance of counsel anymore, trial counsel is not to share the files of the case to the state. Trial counsel is not supposed to speak with the state. And as a district court found, that was an intentional act. That is a strategic act. So what they testify to, that's one piece of information that you can consider, but their actions speak louder than their words. And the district court found that was an intentional act. And there's certainly nothing in the record that would warrant a finding that that was clear error on the district court. I'm sorry, I've taken up so much of your time and I apologize. I just have one very picky doctrinal question I just wanted to remember to ask you. So picky, but why, the district court granted summary judgment on the two Martinez claims. Is that right? Because I mean, it's not as though they're, I mean, it's not really summary judgment. There was a hearing and the court made factual findings. So this is more like a, it's a totally picky little question. And I don't, but is summary judgment, assuming that relief was properly denied, does summary judgment go along with that on the Martinez claims, given that there were fact findings by the court? Well, the Martinez hearing was to determine whether or not the exception applied. And it found that I think summary judgment would be appropriate. But isn't summary judgment for when there are no disputes of fact. And here the, in order to say, this is a case involving no disputes of fact. It's a stupid, picky little question. I just am trying to figure out why this is a summary judgment case. Well, if, if the claims weren't substantial, then summary judgment would be appropriate. Okay. And I see that my time is up. If the court has any other questions for me, I'll be happy to answer. Thank you, Mr. Ross. Mr. Mazino. Thank you, Your Honor. I'll be brief. Just a few points I want to address. First on the investigation. I think as the court's questions pointed out, really the only thing you need to do to see how inadequate this investigation was all of which took place in the three weeks before the trial, is to contrast it with the investigation that Ms. Dean did later, which discovered so much more information. And Mr. Ross also referred to Dr. Rogers. There's no indication that Dr. Rogers had any of this information. We don't have his file. He didn't remember what he had done. The only thing he did remember is that when he was in meetings with trial counsel, he felt like he wasn't really talked at and not being listened to much. So that's all we have on that. On the issue of the AIDS defense, Mr. Ross said the rug was pulled out on that. But of course, there's no reason at all why trial counsel couldn't have complied with Mr. Stokes' instructions about not putting in his AIDS diagnosis and still put in evidence about the abuse and deprivation he suffered as a child long before he contracted that disease. As the court's questions rightly pointed out, nothing could possibly have surprised counsel about the jury's reaction to the facts of this crime. And of course, you could make that argument in every death penalty case. The death penalty has been limited to a narrow category of the most brutal and serious crimes. In every one of those cases, a lawyer could say, boy, the jury was really perturbed by the facts here. And that just can't be an excuse for not presenting any mitigating evidence. It's also clear that the jury here was scrutinizing this evidence carefully. Most of the evidence of the details of the crime Mr. Ross referred to came from the testimony of Norris Martin. Mr. Martin hadn't testified to any of those details until more than a year after the crime. He had given multiple statements to the police where he didn't mention them. And so it's clear that the jury had questions about the truthfulness of that testimony. And ultimately, I think what's clear is that trial counsel just didn't understand how to use mitigating evidence in a case like this. Mr. Ross talks about how aggravated these facts were. Mitigating evidence is needed to counter that, to explain, so that the jury doesn't just see Mr. Stokes as a monster, so they can at least try to understand how he got there. What happened to him that made him capable of doing these things? And there was no way for the jury to have any insight into that. Mr. Ross also talked about, quite a bit actually, about some of this evidence being double-edged. And I really want to address that. Because, and I point the court, I think Mr. Weibel gave a helpful explanation of this at page 3301 of the joint appendix. There is no danger in South Carolina of opening the door. This comes up in some cases from other states, where if you put in evidence of the defendant's background or character, you're opening the door to additional evidence coming in on the other side. That's not true in South Carolina. The state was allowed to present whatever it wanted regarding Mr. Stokes' character and background, and it did present extensive evidence on those issues. What Mr. Sarah, Mr. Stokes' sister, in her interview mentioned that Sammy bullied Norris Martin when they were both children many, many years before this crime took place. First of all, there's no indication the prosecution was interested in asking about that. If they were, they could have asked Norris Martin. They could have asked Audrey Smith. They could have called Spencer Utze. This wasn't part of their presentation at all, so there's no reason they would have asked about it. If they had, it would have been such a drop in the bucket. Again, this is vague testimony about the relationship between these two individuals when they were children. It wouldn't have shed any light on their respective roles in this crime that they committed many years later as adults. Dr. Garbarino, his credibility is really not the issue here. This is a red herring. He was offered as an example of a type of expert who could have and there's no dispute either about the facts of the mitigating evidence that he testified to or about the test that he applied that concluded that Mr. Stokes had a more traumatic childhood than 99.9% of everyone in the country. Those facts just aren't disputed. So just to wrap up, Your Honor, this really is an extraordinary case. We're not aware of any case where a death sentence was allowed to stand, where this type of mitigating evidence of childhood trauma was readily available and the jury didn't hear any of it. I think, you know, the prosecutor was able to tell the jury in closing that it had heard, quote, nothing about this man other than violence. The jury needs to hear more than that to make the moral judgment that it's charged with making in this kind of case. Thank you, Your Honor. Thank you, Ms. Mazzina and Mr. Ross. We appreciate your argument. Can't come down and shake your hands. Please know. Hope that you will be safe and well. Thank you so much. The Honorable Court will take a brief recess. Thank you.
judges: Roger L. Gregory, Pamela A. Harris, A. Marvin Quattlebaum Jr.